| | | |
|---|---|---|
| ********************************* | ) | Case No. 01-61119 (DHA) |
| | ) | |
| In Re: | ) | Chapter 11 |
| | ) | |
| AMF BOWLING WORLDWIDE, INC., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| ********************************* | ) | |
| | ) | |

**FINAL ORDER (I) AUTHORIZING POST-PETITION SECURED
SUPERPRIORITY FINANCING PURSUANT TO SECTIONS 105(a),
362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(d) OF THE BANKRUPTCY CODE,
(II) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL
PURSUANT TO SECTION 363(c) OF THE BANKRUPTCY CODE, AND
(III) GRANTING ADEQUATE PROTECTION PURSUANT
TO SECTIONS 361, 363 AND 364 OF THE BANKRUPTCY CODE**

Upon the motion, dated July 2, 2001 (the "**Motion**"), of AMF Bowling Worldwide, Inc. (the "**Borrower**" or "**WINC**"), AMF Group Holdings Inc., AMF Bowling Holdings Inc., AMF Bowling Products, Inc., AMF Bowling Centers Holdings Inc., AMF Worldwide Bowling Centers Holdings Inc., AMF Bowling Centers, Inc., AMF Beverage Company of Oregon, Inc., AMF Beverage Company of W. Va., Inc., Bush River Corporation, King Louie Lenexa, Inc., 300, Inc., American Recreation Centers, Inc., Michael Jordan Golf Company, Inc., MJG-O'Hare, Inc., AMF Bowling Centers (Aust.) Int'l Inc., AMF Bowling Centers (Hong Kong) Int'l Inc., AMF Bowling Centers Int'l Inc., AMF BCO-UK One, Inc., AMF BCO-UK Two, Inc., AMF BCO-France One, Inc., AMF BCO-France Two, Inc., AMF Bowling Centers Spain, Inc., AMF Bowling Mexico Holding, Inc., and Boliches AMF, Inc., (collectively, the "**Guarantors**"), as debtors and debtors in possession (the Borrowers and the Guarantors, collectively, the "**Debtors**"), seeking entry of an order (this "**Order**"):

(a) authorizing the Borrower to obtain credit and incur debt secured by liens (as defined in section 101(37) of Title 11, United States Code, as amended (the "**Bankruptcy Code**") and referred to herein as "**Liens**") on property of the Debtors' estates pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code;

(b) authorizing the Debtors to use cash collateral and other collateral pursuant to sections 363(c) and 363(e) of the Bankruptcy Code and Bankruptcy Rule 4001(b), on the terms and conditions set forth in this Order;

(c) authorizing the Debtors to incur postpetition senior secured financing (the "**DIP Credit Facility**") in accordance with that certain Senior Secured Priming Debtor-in-Possession Credit Agreement dated as of July 5, 2001 (the "**DIP Loan Agreement**") among the Borrower, the Guarantors, Citibank, N.A., as Collateral Agent and Administrative Agent (the "**Agent**"), and the lenders named therein (the "**Lenders**"), substantially in the form annexed to the Motion as Exhibit B, and incur the Obligations as provided for in the DIP Loan Agreement (the "**Obligations**");

(d) authorizing the Debtors to provide the Agent (for the ratable benefit of the Agent and the Lenders) with Liens upon the Debtors' property as provided in and as contemplated by the DIP Loan Agreement and the Security Agreement (as defined in the DIP Loan Agreement) (the DIP Loan Agreement, the Security Agreement and all such instruments and documents as may be executed and delivered in connection therewith or which relate thereto, collectively, the "**DIP Loan Documents**"), as supplemented by this Order, subject and subordinate to the Carve-Out (as defined below);

(e) authorizing the Debtors to grant the Agent (for the ratable benefit of the Agent and the Lenders) a Super-Priority Claim (as defined below) over any and all administrative expenses, other than as set forth in Paragraph 13 below, subject and subordinate to the Carve-Out; and

(f) authorizing the Debtors to provide adequate protection to Citibank, N.A., as Administrative Agent (the "**Pre-Petition Agent**") under, and to the lenders and the financial

2

institutions party (together with the Pre-Petition Agent, the **"Pre-Petition Lenders"**), to that certain Fourth Amended and Restated Credit Agreement, dated as of June 14, 1999 (as amended from time to time, the **"Pre-Petition Credit Agreement"**) among WINC, as Borrower, the Pre-Petition Agent and the Pre-Petition Lenders, subject to the Carve-Out, on account of the pre-petition debt under the Pre-Petition Credit Agreement and all collateral and ancillary documents executed in connection therewith (the **"Pre-Petition Collateral Documents"**), to protect the Pre-Petition Lenders from any diminution in the value of the Pre-Petition Lenders' interests in the Pre-Petition Collateral (as defined below) resulting from (i) the Debtors' use of Cash Collateral (as defined below), (ii) the priming liens and security interests to be granted herein pursuant to section 364(d) of the Bankruptcy Code to secure the Obligations, (iii) the use, sale or lease of the Pre-Petition Collateral (as defined in Paragraph M below) other than Cash Collateral, and (iv) the imposition of the automatic stay pursuant to section 362(a)of the Bankruptcy Code.

It appearing that, absent the relief requested herein, the Debtors will suffer immediate and irreparable harm; and it further appearing that notice of the Motion is sufficient and complies with the requirements of Bankruptcy Rules 4001(c) and 4001(d); and for good cause shown;

<u>THE COURT HEREBY FINDS THAT:</u>

A. On July 2, 2001 (the "**Petition Date**"), each of the Debtors filed with this Court a voluntary petition under chapter 11 of the Bankruptcy Code. On July 3, 2001, this Court entered an interim order approving the relief requested in the Motion (the "Interim Order").

B. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases. An official committee of unsecured creditors (the "**Creditors' Committee**") was appointed pursuant to section 1102 of the Bankruptcy Code on July 17, 2001.

C. This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these chapter 11 cases (the "**Cases**"), and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of

the Bankruptcy Code and Rule 4001 (b) and (c) of the Federal Rules of Bankruptcy Procedure. Venue of the Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D. An immediate need exists for the Debtors to obtain funds and financial accommodations with which to continue their operations, meet their payroll and other necessary, ordinary course business expenditures, acquire raw materials, goods and services, satisfy the adequate protection provision hereunder, and administer and preserve the value of their estates. The ability of the Debtors to finance their operations requires the additional availability of working capital, the absence of which would immediately and irreparably harm the Debtors, their estates, and their creditors and the possibility for a successful reorganization.

E. The Debtors are unable to obtain unsecured credit allowable only as an administrative expense allowable under section 503(b)(1) of the Bankruptcy Code.

F. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code except under the terms and conditions provided in this Order. The Debtors are unable to obtain credit for borrowed money without the Debtors' granting to the Agent (for the ratable benefit of the Agent and the Lenders) (i) Liens on various of the assets of the Debtors pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and (ii) a super-priority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code, in each case as provided by this Order.

G. The ability of the Debtors to finance their operations and the availability of sufficient working capital through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to the Debtors' ability to preserve and maintain their going concern value and their ability to consummate a successful reorganization.

H. The relief requested in the Motion is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their properties.

4

I.     It is in the best interest of Debtors' estates to be allowed to establish the DIP Credit Facility contemplated by the DIP Loan Agreement and the other DIP Loan Documents.

J.     The terms and conditions of the DIP Credit Facility, including those which provide for the payment of interest to, and fees of, the Agent (for the ratable benefit of Agent and the Lenders) at the times, and in the manner provided under the DIP Credit Facility, are fair, reasonable, and the best available under the circumstances.

K.     The DIP Loan Agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the Agent and the Lenders, on the other hand. Credit to be extended under the DIP Credit Facility will be so extended in good faith, in consequence of which the Agent and the Lenders are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

L.     Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lenders made loans and other financial accommodations to or for the benefit of WINC and its subsidiaries, including the Guarantors. As of the Petition Date, the aggregate principal amount due and owing to the Pre-Petition Lenders under the Pre-Petition Credit Agreement was approximately $622.6 million, as follows: (i) $52.5 million in respect of Term Loan Advances (as defined in the Pre-Petition Credit Agreement), (ii) $181.5 million in respect of AXELs Series A Advances (as defined in the Pre-Petition Credit Agreement), (iii) $131.1 million in respect of AXELs Series B Advances (as defined in the Pre-Petition Credit Agreement), (iv) $249 million in respect of Working Capital Advances (as defined in the Pre-Petition Credit Agreement) and (v) $8.5 million in respect of Letter of Credit Advances (as defined in the Pre-Petition Credit Agreement and all or a portion of which may have been drawn), plus interest, commitment, agents' and other fees, and costs, charges and expenses (including professionals' fees and disbursements) (the **"Pre-Petition Lenders' Claim"**).

M.     Pursuant to the Pre-Petition Collateral Documents, the Borrower's liabilities under the Pre-Petition Credit Agreement are secured by security interests in, and liens on, certain of the Debtors' real and personal property located in the United States as more particularly described in, and evidenced by, the Pre-Petition Credit Agreement and the Pre-

Petition Collateral Documents, including, without limitation, certain: accounts; inventory; equipment; general intangibles; investment property; leaseholds; and fee owned real estate (the **"Pre-Petition Collateral"**).

N.     Without prejudice to the rights of third parties as provided below, the Debtors hereby waive and release any right they may have to challenge (i) the Pre-Petition Lenders' Claim, (ii) that the Pre-Petition Lenders have valid, perfected and unavoidable security interests in, and liens on, the Pre-Petition Collateral, (iii) that the Debtors have no offsets, defenses, claims or counterclaims against the Pre-Petition Lenders with respect to the Pre-Petition Lenders' Claim; and (iv) as of the Petition Date, the Pre-Petition Lenders' Claim is an allowed secured claim within the meaning of section 506 of the Bankruptcy Code in an amount that is not less than $622.6 million. Each of the Guarantors has guaranteed the Pre-Petition Lenders' Claim. The Debtors further admit that the Pre-Petition Lenders are beneficiaries of subordination provisions contained in that certain (i) Indenture, dated as of March 21, 1996, by and among WINC, the guarantor parties thereto, and The Bank of New York, as Trustee, pursuant to which Senior Subordinated Notes in the original principal amount of $250,000,000 due 2006 were issued, and (ii) Indenture, dated as of March 21, 1996, among WINC, the guarantor parties thereto, and First Bank of Minnesota, N.A., as Trustee, pursuant to which Senior Subordinated Discount Notes in the original principal amount of $452,000,000 due 2006 were issued, in each case subject to the subordination provision contained therein (the **"Subordination Provisions"**) (the holders of the Senior Subordinated Notes and the Senior Subordinated Discount Notes are hereinafter called the **"Subordinated Note Holders"**). The Debtors further admit that, the Subordination Provisions subordinate the Subordinated Note Holders' rights to payment to the prior payment and satisfaction of the senior indebtedness (as defined in the Subordination Provisions), which term includes the Pre-Petition Lenders' Claim.

O.     The Pre-Petition Lenders are entitled, pursuant to sections 361, 363(c), 363(e) and 364(d) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral (including their interest in the cash and cash equivalent proceeds of the Pre-Petition Collateral that constitutes "cash collateral" within the meaning of section 363 of the Bankruptcy Code, but excluding certain funds held on behalf of third parties, including prize money paid by league bowlers, proceeds from lottery sales, and certain charitable donations (the

6

"**Cash Collateral**")) from any diminution in value of the Pre-Petition Collateral resulting from the use, sale or lease thereof, the imposition of the automatic stay and the priming of the Pre-Petition Lenders' liens on the Pre-Petition Collateral securing the Pre-Petition Claim by the Liens in favor of the Agent and Lenders granted in this Order and the DIP Loan Documents pursuant to section 364(d) of the Bankruptcy Code. In the business judgment determination of the Debtors regarding their best interests, the Debtors have agreed to provide adequate protection to the Pre-Petition Lenders on the terms and conditions set forth in Paragraph 9 of this Order, which terms and conditions are fair and reasonable and were negotiated in good faith and at arm's length.

P.     Notice of the hearing seeking entry of this Order and the relief requested in the Motion (the "**Hearing**") was given in the manner specified in the Interim Order. Such notice constitutes good and sufficient notice of the Hearing under the circumstances in accordance with Bankruptcy Rules 4001(b), 4001(c) and section 102(1) of the Bankruptcy Code, as required by sections 363(c), 363(e), 364(c) and 364(d) of the Bankruptcy Code in light of the nature of the relief requested in the Motion.

Q.     Good and sufficient cause has been shown for the entry of this Order. Among other things, the entry of this Order will enable the Debtors to continue the operation of their businesses; increase the possibility for a successful reorganization; avoid disputes with the Pre-Petition Lenders with respect to adequate protection; and be in the best interests of the Debtors, their creditors, and their estates.

R.     Any objections to the entry of this Order (the "**Objections**") have been resolved or overruled.

NOW THEREFORE, based upon the Motion of the Debtors and the record before the Court with respect to the Motion made by the Debtors at the Hearing and in connection with the approval of the Interim Order on July 3, 2001, and with the consent of the Debtors, the Agent, and the Pre-Petition Lenders to the form and entry of this Order, and good cause appearing,

IT IS ORDERED that:

## APPROVAL OF AND AUTHORIZATION AS TO BORROWING

1.  The terms and the conditions of the DIP Credit Facility are hereby approved. The Debtors are authorized to:

(a) Establish the DIP Credit Facility.

(b) Execute each of the DIP Loan Documents to which any Debtor is a party.

(c) With respect to the Borrower, borrow up to $75,000,000 under the DIP Credit Facility with a sublimit of $15,000,000 with respect to letters of credit.

(d) Pay all fees and expenses required under the DIP Credit Facility.

2.  The Debtors are hereby authorized and empowered to do and perform all acts and to make, execute, and deliver all instruments and documents which may be requisite or necessary for (a) the performance by the Debtors under the DIP Loan Documents and the creation and perfection of (i) the Liens described in and provided for by the DIP Loan Documents, and (ii) the Adequate Protection Liens (as defined below), and (b) the creation and perfection of Liens on property located in foreign jurisdictions to the extent required by the DIP Loan Documents.

3.  The Debtors are hereby authorized to grant to the Agent (for the ratable benefit of the Agent and the Lenders) valid, binding, enforceable and perfected security interests in, and Liens upon, all collateral security (the **"DIP Collateral"**) to be provided pursuant to the DIP Loan Documents to secure all Obligations incurred under the DIP Loan Documents, including, without limitation,

> all stock of the Borrower and Guarantors and their respective present and future subsidiaries, *provided* that such Liens, in the case of any foreign subsidiary, shall be limited to sixty-five percent (65%) of the voting stock of such foreign subsidiary (to the extent Liens on any greater percentage would result in adverse tax consequences to the Borrower), and such other property and interests, real and personal, tangible and intangible, whether now owned or hereafter acquired (and in each case without regard to whether acquired prior or subsequent to the Petition Date), of the Borrower and the Guarantors including, without limitation, all inventory, accounts, general intangibles, investment property, chattel paper, goods, furniture, fixtures, equipment, intellectual property, contracts, books and records, cash (respectively if and as defined in the Uniform Commercial Code); causes of action, rights to payment including tax refund claims, insurance

proceeds and tort claims (including actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under sections 506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code (the "**Avoidance Action Collateral**")); all leasehold interests of the Borrower and the Guarantors described in the DIP Loan Documents; all intercompany indebtedness arising from any transfer of funds between Debtors on or after the Petition Date in accordance with the cash management system of the Debtors (as approved by this Court by separate order) (the "**Post-Petition Intercompany Indebtedness**"); all real estate owned by the Borrower or any Guarantor or in which the Borrower or any Guarantor has an interest; and all products and proceeds of the foregoing.

4.    The automatic stay imposed under section 362(a)(4) of the Bankruptcy Code is hereby lifted to permit the Debtors to grant the aforesaid Liens and the Adequate Protection Liens and to perform the Debtors' liabilities and Obligations to the Agent and the Lenders under the DIP Credit Facility.

5.    Each officer of the Debtors as may be so authorized by the Board of Directors of each of the Debtors, acting singly, is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the Debtors.

6.    The Debtors are hereby authorized to use Cash Collateral and other property in which the Pre-Petition Agent and the Pre-Petition Lenders have an interest pursuant to sections 363(b) and 363(c) of the Bankruptcy Code in accordance with the terms and conditions of the DIP Loan Agreement; *provided, however*, that, irrespective of whether the DIP Loan Agreement at any particular time is effective between or constitutes binding obligations of the parties thereto, such Cash Collateral may only be used (a) as authorized and permitted herein and only so long as (i) no Event of Default shall have occurred and is continuing under the DIP Loan Agreement, (ii) the Termination Date shall not have occurred under the DIP Loan Agreement, and (iii) the Debtors are not in default of their material adequate protection obligations under this Order, including, without limitation, payment of the Monthly Interest Payments (as defined below), or (b) if the Court shall subsequently enter an order, following notice to, among other parties, the Pre-Petition Lender, and a hearing, authorizing such use of the Cash Collateral.

7.     The provisions of Paragraphs L, M and N above and Paragraphs 9(a) and (b) below shall be without prejudice to the right of the Creditors' Committee to seek (i) to disallow the Pre-Petition Lenders' Claim, (ii) to avoid any lien, security or collateral interest in the assets of the Debtors claimed by the Pre-Petition Lenders in Pre-Petition Collateral, (iii) to otherwise challenge the validity, priority or extent of the Pre-Petition Lenders' Claim or the Pre-Petition Lenders' security interests in or liens upon the Pre-Petition Collateral, (iv) to obtain any other relief of any type or nature whatsoever, legal or equitable, against the Pre-Petition Lenders, or otherwise recover from the Pre-Petition Lenders on account of their relationship with the Debtors prior to the commencement of these proceedings, and (v) to challenge the application of any Monthly Interest Payment, *provided, however,* that the Creditors' Committee shall have through and including October 7, 2001, within which to file any such objection or commence any such action with respect to the Pre-Petition Lenders' Claim or the Pre-Petition Lenders' security interests in or liens upon the Pre-Petition Collateral. If no such objection or action is filed on or before October 7, 2001, the Pre-Petition Lenders' Claim shall be allowed as a secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Cases. Thereafter, any and all challenges (including, but not limited to, those under sections 544, 547 or 548 of the Bankruptcy Code) by any party (including, without limitation, the Creditors' Committee and any subsequently appointed trustee), to the validity, sufficiency, extent, perfection, refinancing or avoidance of the Pre-Petition Lenders' security interests in or liens upon the Pre-Petition Collateral or the Pre-Petition Lenders' Claim shall be forever barred.

8.     The Liens to be created and granted to the Agent (for the ratable benefit of the Agent and the Lenders), as provided in Paragraph 3 above, are created pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and, with respect to the Pre-Petition Lenders' liens only, section 364(d) of the Bankruptcy Code. With the exception of (a) the Carve-Out (including the Retained Payments, as defined below), and (b) property of any of the Debtors' estates which, on the Petition Date, was subject to a valid and perfected lien (other than any lien of the Pre-Petition Lenders) or becomes subject to a valid lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of pre-petition claims is expressly permitted under the Bankruptcy Code (the **"Permitted Prior Liens"**), the Liens to be created and granted to the Agent (for the ratable benefit of the Agent and the Lenders), as provided in Paragraph 3 above, are first, prior, perfected, and superior to any security, mortgage,

or collateral interest or Lien or claim to the DIP Collateral, except for such other Liens as are permitted under the DIP Loan Documents ("**Permitted DIP Liens**"). Notwithstanding anything to the contrary set forth elsewhere in this Order, the Liens to be created and granted to the Agent (for the ratable benefit of the Agent and the Lenders), as provided in Paragraph 3 above, shall be, and hereby are, senior in priority to any and all Adequate Protection Liens of the Pre-Petition Lenders.

9. (a) The Debtors are hereby authorized, as adequate protection for the Pre-Petition Lenders from any diminution in value of the Pre-Petition Lenders' interests in the Pre-Petition Collateral resulting from (i) the use, sale or lease of the Pre-Petition Collateral (including Cash Collateral), (ii) the imposition of the automatic stay, and (iii) the priming of the liens on the Pre-Petition Collateral by the Liens in favor of the Agent and Lenders granted in this Order and the DIP Loan Documents pursuant to section 364(d) of the Bankruptcy Code, to grant to the Pre-Petition Agent (for the ratable benefit of the Pre-Petition Agent and the Pre-Petition Lenders), effective upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise, (x) valid, binding, enforceable and perfected replacement security interests in, and Liens upon, all of the Debtors' right, title and interest in, to and under the DIP Collateral, including the Avoidance Action Collateral other than avoidance actions and proceeds of Avoidance Action Collateral received from the Pre-Petition Lenders (the "**Adequate Protection Liens**"), *provided, however,* that the Pre-Petition Agent shall not seek to apply any proceeds of Avoidance Action Collateral towards the satisfaction of any amounts owed to the Pre-Petition Lenders pursuant to the terms of this Order unless and until the proceeds of all other Adequate Protection Liens shall be insufficient to satisfy such amounts in full, and (y) the Junior Super-Priority Claim (as defined below). The Adequate Protection Liens and the Junior Super-Priority Claim shall be, and hereby are, subject and subordinate in priority to (i) the Carve-Out (including the Retained Payments), (ii) Liens on the DIP Collateral pursuant to the DIP Loan Documents to secure all Obligations incurred under the DIP Loan Documents, (iii) Permitted Prior Liens, and (iv) Permitted DIP Liens. The Agent and the Lenders shall have no obligations to the Pre-Petition Lenders with respect to the DIP Collateral, including: (i) any collection, sale or other

11

disposition of any or all of the DIP Collateral by the Lenders shall be free and clear of any and all security interests, liens and claims of the Pre-Petition Lenders, (ii) the Pre-Petition Lenders will not oppose, interfere with or otherwise attempt to prevent the Lenders from enforcing their security interests in, or Liens on, any of the DIP Collateral, (iii) the Pre-Petition Lenders have waived any and all rights to require the Lenders to (a) marshall any property or assets of the Debtors, or (b) enforce any guaranty or any security interest or lien given by any person or entity other than any of the Debtors to secure the payment of any or all of the indebtedness as a condition precedent or concurrent to taking any action against or with respect to the DIP Collateral.

(b) The Debtors are hereby further authorized, as additional adequate protection for the benefit of the Pre-Petition Lenders, (i) to pay in arrears to the Pre-Petition Agent (for the ratable benefit of the Pre-Petition Agent and the Pre-Petition Lenders) on the last business day of each month current, contract rate (i.e., non-default rate) interest and letter of credit fees (the "**Monthly Interest Payment**"), under the Pre-Petition Credit Agreement (the payments described in this clause to be without prejudice both to the rights of the Pre-Petition Lenders to assert a claim for the payment of additional interest calculated at any other applicable rates of interest, or on any other basis, set forth in the Pre-Petition Credit Agreement, and the legal and equitable rights and defenses of the Debtors with respect to any such asserted claim), *provided, however*, that the Debtors shall be authorized to pay immediately upon closing of the DIP Credit Facility accrued but unpaid pre-petition interest at the default rate due under the Pre-Petition Credit Agreement through and including the Petition Date, and (ii) to reimburse on a current basis reasonable fees and expenses (including, but not limited to, the reasonable fees and disbursements of counsel and internal and third-party consultants, including financial consultants and auditors) incurred by the Pre-Petition Agent (including any unpaid pre-petition fees and expenses) and the continuation of the payment to the Pre-Petition Agent on a current basis of the administration fees that are provided for thereunder; *provided, however,* that nothing set forth in this Order shall be deemed to prejudice in any way the rights of the Pre-Petition Lenders to seek additional adequate protection with respect to the Pre-Petition Collateral or the Debtors' use of Cash Collateral consistent with and subject to the terms of this Order, following notice and

hearing, pursuant to subsequent order of the Court. The Debtors' payment obligations herewith are expressly conditioned on the continued effectiveness of the DIP Credit Facility. The payment of interest and expenses as provided in this Paragraph 9 shall be subject to disgorgement to the Agent and the Lenders to the extent that any Obligations under the DIP Loan Agreement shall have not been paid in full within fifteen (15) days of final maturity of the Obligations.

(c)     The Debtors shall (i) provide to the Pre-Petition Agent and counsel to the Pre-Petition Lenders the same reports the Debtors are required to provide to the Agent under the DIP Loan Documents, and (ii) subject to two (2) business days' prior notice, provide to the Pre-Petition Agent reasonable supervised access to the Debtors' books and records during regular business hours.

(d)     The Prepetition Lenders shall turn over all Cash Collateral received by them to the Debtors.

10.     This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of (i) the Agent's Liens upon the DIP Collateral to secure all Obligations incurred under the DIP Loan Documents, and (ii) the Adequate Protection Liens, in each case without the necessity of filing or recording any financing statement, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Agent or the Pre-Petition Agent upon the DIP Collateral, or to entitle the Agent or the Pre-Petition Agent to the priorities granted herein (including, in respect of cash, any requirement that the Agent or a Lender have possession of or dominion and control over, any such cash in order to perfect an interest therein); *provided, however,* that the Debtors may execute and the Agent may file or record financing statements or other instruments to evidence and to perfect the Liens authorized hereby; and *provided, further, however,* that no such filing or recordation shall be necessary or required in order to create or perfect any such Lien.

11.     The Agent and the Pre-Petition Agent, in their respective discretion, each may file a xerographic copy of this Order as a mortgage, financing statement or similar

13

perfection document with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property.

12.     The DIP Loan Agreement and each of the DIP Loan Documents, respectively, shall constitute and evidence the valid and binding Obligations of each of the Debtors, which Obligations shall be enforceable against each of the Debtors in accordance with their terms.

ADMINISTRATIVE CLAIM

13.     (a)     The Obligations under the DIP Credit Facility shall be an allowed administrative expense claim with priority, subject and subordinate to the Carve-Out (including the Retained Payments), under section 364(c)(1) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), and 1114 of the Bankruptcy Code (the "**Super-Priority Claim**").

(b)     All Post-Petition Intercompany Indebtedness shall be an allowed administrative expense claim with priority under section 364(c)(1) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, except for the Super-Priority Claim, and the Carve-Out (including the Retained Payments), and such claims on account of Post-Petition Intercompany Indebtedness shall be part of the DIP Collateral securing all Obligations incurred under the DIP Loan Documents.

(c)     The Pre-Petition Lenders shall be entitled to all of the benefits of section 507(b) of the Bankruptcy Code; *provided, however,* that any claim of the Pre-Petition Lenders arising thereunder shall be (i) an allowed administrative expense claim junior in priority and subordinate in all respects to only the Super-Priority Claim (subject to Paragraph 18, below), the Carve-Out (including the Retained Payments), and Post-Petition Intercompany Indebtedness, and (ii) otherwise senior in priority over all

14

administrative expense claims and unsecured claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and all other claims of the kinds specified in or ordered pursuant to sections 105, 326, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code (the "**Junior Super-Priority Claim**"), and *provided, further, however,* that the Junior Super-Priority Claim shall not attach to recoveries from actions under sections 506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code to the extent that such recoveries are received from the Pre-Petition Lenders.

14.    Except for the Carve-Out (including the Retained Payments), no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 330 and 331 of the Bankruptcy Code that have been or may be incurred in these chapter 11 cases, and no priority claims to the DIP Collateral are, or will be, prior to or on a parity with the Obligations under the DIP Credit Facility, or with any other claims of the Agent arising hereunder.

15.    The term "**Carve-Out**" means an amount not exceeding in the aggregate $2,500,000, which amount may be used by the Debtors after the occurrence and during the continuance of a Default or an Event of Default, notwithstanding the Agent's Liens for the benefit of the Lenders in the DIP Collateral and the Agent's rights and Super-Priority Claims hereunder, to pay fees or expenses incurred by the Debtors constituting (i) allowances of compensation for services rendered or reimbursement or expenses awarded by the Court under sections 330 and 331 of the Bankruptcy Code or otherwise, to Debtors' professionals employed at the expense of the Debtors' estates in the cases pursuant to section 327 of the Bankruptcy Code, (the "**Debtors' Professionals**"), (ii) allowances of compensation for services rendered or reimbursement of expenses awarded by the Court under section 105(a), 330 or 331 of the Bankruptcy Code, to accountants, attorneys and other professionals retained in the Cases by the Creditors' Committee pursuant to section 1103 of the Bankruptcy Code (the "**Committee's Professionals**") or any examiner appointed in accordance with section 1104 of the Bankruptcy Code (other than an examiner of the type referred to in Section 6.01(s) of the DIP Loan Agreement), (iii) fees required to be paid to the Office of the United States Trustee under Section

1930(a), Title 28, United States Code, and (iv) the actual, necessary expenses, other than compensation, and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code, incurred by a member of the Creditors' Committee (but excluding fees and expenses of third party professional persons employed by individual Creditors' Committee members), if such expenses are incurred in the performance of the duties of the Creditors' Committee and are allowed by the Court; *provided, however,* that (a) the amount of such fees and expenses shall not exceed $2,500,000 (in addition to compensation awarded on a monthly or other interim basis in accordance with applicable Orders of the Court prior to the occurrence of a Default or an Event of Default (whether or not paid)) (the "**Retained Payments**") and (b) such dollar limitation on fees and disbursements shall not include any retainer fees paid to the Debtors' Professionals prior to the Petition Date and shall not be reduced by the amount of any compensation and reimbursement of expenses paid prior to the occurrence of a Default or the Event of Default in respect of which the Carve-Out is invoked or any fees, expenses, indemnities or other amounts paid to the Agent, the Lenders and their attorneys and agents under the DIP Loan Agreement or otherwise; and *provided, further, however,* that in no event shall there be paid from proceeds of the DIP Loan Agreement any fees or expenses incurred in challenging the liens or claims of the Pre-Petition Agent or the Pre-Petition Lenders, although, subject to the Carve-Out, the Committee's Professionals may be paid (to the extent allowed by the Court) fees and expenses incurred in analyzing such liens or claims. The Carve-Out shall in any event exclude any fees and expenses arising as to services rendered after conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. The payment of the Carve-Out and the Retained Payments shall not reduce, or be deemed applied in reduction of, the DIP Lenders' claims against the Debtors. Nothing set forth in this Paragraph 15 shall be deemed to prejudice, in any way, the Agent's right or the Pre-Petition Agent's right to object to any request made by any of the Debtors' Professionals or of the Committee's Professionals for payment of fees and services.

16.     The Debtors agree that no cost or expense which is incurred by the Debtors in connection with or on account of the preservation or disposition of any DIP Collateral or which otherwise could be chargeable to the Agent, the Pre-Petition Agent or the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, shall be chargeable to the Agent, the Pre-Petition Agent or the DIP Collateral, except for the Carve-Out and the Retained Payments.

17.     Unless the Agent has provided its prior written consent or all liabilities and all Obligations under the DIP Credit Facility have been or will be indefeasibly paid in full in cash, there shall not be entered in these proceedings or in any successor cases, any order which, other than as permitted under the DIP Loan Agreement, authorizes:

(a)     the obtaining of credit or the incurring of indebtedness that is (i) secured by a security, mortgage, or collateral interest in or other lien on, all or any portion of the DIP Collateral which is equal or senior to the Liens and security interests held by the Agent or the Pre-Petition Agent, or (ii) entitled to priority administrative status which is equal or senior to the Super-Priority Claim or the Junior Super-Priority Claim;

(b)     the enforcement of any claimed security, mortgage, or collateral interest or other lien of any person other than of the Agent on all or any portion of the DIP Collateral (other than liens on property of any of the Debtors' estates which, as of the Petition Date was subject to a valid and perfected lien (other than any lien of the Pre-Petition Lenders), constitutes a Permitted Prior Lien or a Permitted DIP Lien, in each case only to the extent having priority over the Liens of the Agent);

(c)     the dismissal of any of the Debtors' chapter 11 cases under section 1112 of the Bankruptcy Code or otherwise; or

(d)     any payment or the transfer of any property on account of claims asserted by vendors of any Debtor for reclamation in accordance with section 546(c) of the Bankruptcy Code, or the Debtors' return of goods constituting DIP Collateral pursuant to section 546(g)* of the Bankruptcy Code or other applicable law.

18.     Notwithstanding anything to the contrary contained in this Order, nothing herein shall limit the Debtors' ability to grant (i) superpriority claims in accordance with section 364 of the Bankruptcy Code and (ii) liens senior to those held by the Agent or the Pre-Petition Agent pursuant to this Order or the Pre-Petition Collateral Documents in conjunction with and subject to the completion of a Court-approved refinancing and indefeasible payment in full in cash of the Obligations under the DIP Credit Facility in connection with or in contemplation of

the occurrence of the Termination Date, *provided, however,* that the amount of such refinancing shall not exceed $75 million.

19.    Without limiting the provisions and protections of Paragraphs 17 and 18 above, if at any time prior to the indefeasible repayment in full in cash of all Obligations under the DIP Credit Facility and the termination of the Agent's obligation to make loans and advances under the DIP Loan Documents, any Debtor or any trustee subsequently appointed shall obtain credit or incur debt pursuant to section 364(b), 364(c) or 364(d) of the Bankruptcy Code, then, except as permitted or contemplated by the DIP Loan Agreement, all of the consideration for such credit or debt shall immediately be turned over to the Agent in reduction of the Obligations under the DIP Credit Facility.

20.    All Obligations of the Debtors to the Agent and the Lenders under the DIP Credit Facility are due and payable upon the earliest to occur of

(a)    July 2, 2002;

(b)    the date of termination in whole of the Commitments (as defined in the DIP Loan Agreement) pursuant to Section 2.05 or Section 6.01 of the DIP Loan Agreement; or

(c)    the effective date of any plan of reorganization for any of the Debtors in these chapter 11 cases.

Unless and until the Obligations under the DIP Credit Facility are unconditionally and indefeasibly repaid in full in cash, the protections afforded to the Agent under the DIP Loan Documents and hereunder, and any actions taken pursuant thereto and the Carve-Out (as to pre-conversion or pre-effective date services), shall survive the entry of any order confirming a plan of reorganization or converting any of these cases into a case pursuant to chapter 7 of the Bankruptcy Code, and the Liens of the Agent and the Pre-Petition Agent upon the DIP Collateral, and the Super-Priority Claim and the Junior Super-Priority Claim, shall continue in these proceedings and in any such successor case, and such Liens of the Agent and the Super-Priority Claim shall maintain their priority as provided by this Order until the Obligations under the DIP Credit Facility have been unconditionally and indefeasibly repaid in full in cash, and the

Liens of the Pre-Petition Agent and the Junior Super-Priority Claim shall maintain their priority as provided by this Order under any plan of reorganization confirmed in these cases.

21. The time and manner of payment of the Obligations pursuant to the DIP Credit Facility, the Liens upon the DIP Collateral and the Super-Priority Claim shall not be altered or impaired by any plan of reorganization which may hereafter be confirmed or by any further order which may hereafter be entered without the consent of the Lenders, and the Pre-Petition Lenders' rights in respect of the Adequate Protection Liens and the Junior Super-Priority Claim shall not be altered or impaired by any plan of reorganization that may hereafter be confirmed or by any further order that may hereafter be entered without the consent of the Pre-Petition Lenders (subject only to such reservations of rights as are expressly set forth in this Order); *provided, however,* that anything herein to the contrary notwithstanding, nothing in this Order shall impair, prejudice or alter the Debtors' rights to seek and obtain confirmation of a plan of reorganization in accordance with sections 1129(a) and (b) or any other applicable provision of the Bankruptcy Code.

## REMEDIES UPON AN EVENT OF DEFAULT

22. Upon the occurrence of an Event of Default (as defined in the DIP Loan Agreement) and at any time thereafter during the continuance thereof, with five (5) Business Days' prior written notice (an "Enforcement Notice") of any such occurrence, in each case given to the Borrower and the Debtors' counsel, counsel to the Creditor's Committee, the Pre-Petition Agent, the Pre-Petition Lenders and the United States Trustee, the Agent shall be entitled to exercise the Agent's rights and remedies as set forth in the DIP Loan Documents. Such Enforcement Notice shall also be filed with the Court. Immediately upon receipt of such notice, the Debtors shall have no right to use any Cash Collateral or any other proceeds of the DIP Collateral other than towards the satisfaction of the Obligations due to the Agent and the Lenders under the DIP Credit Facility, and the Carve-Out and the Retained Payments. This Order shall not prejudice the rights of any party-in-interest to contest, restrict or condition the exercise of the Lenders' remedies. In addition, immediately following the occurrence and during the continuance of any Event of Default:

(a) the Debtors shall continue to deliver and cause the delivery of the proceeds of DIP Collateral to the Agent, as provided in the DIP Loan Documents;

(b) the Agent shall continue to apply such proceeds in accordance with the provisions of the DIP Loan Agreement and in accordance with this Order, *provided, however*, that the Agent shall not apply any proceeds of Avoidance Action Collateral towards the satisfaction of the Obligations unless and until the proceeds of all other DIP Collateral shall be insufficient to satisfy the Obligations in full;

(c) unless the Obligations have been indefeasibly paid in full in cash, the Debtors' authorization to pay Monthly Interest Payments shall be suspended, and no such payments shall be made; and

(d) any obligation otherwise imposed on the Agent and the Lenders to provide any loan or advance pursuant to the DIP Credit Facility shall be suspended.

23. Nothing included herein shall prejudice, impair, or otherwise affect the rights of the Agent, the Lenders, the Pre-Petition Agent or the Pre-Petition Lenders to seek any other or supplemental relief in respect of the Debtors consistent with and subject to the provisions of this Order, including the rights of the Pre-Petition Agent and the Pre-Petition Lenders to seek additional adequate protection or, during the continuance of an Event of Default, to seek to limit the Debtors' use of Cash Collateral, nor the Agent's or the Lenders' rights, as provided in the DIP Loan Agreement, to seek, during the continuance of a Default or an Event of Default, to limit the Debtors' use of Cash Collateral or to suspend or terminate the making of Advances under the DIP Loan Agreement.

## MISCELLANEOUS PROVISIONS

24. If any provision of this Order is hereafter modified, vacated or stayed by subsequent order of this or any other Court for any reason, such modification, vacation, or stay shall not affect the validity of any liability incurred pursuant to this Order and prior to the later of (a) the effective date of such modification, vacation, or stay, or (b) the entry of the order pursuant to which such modification, vacation, or stay was established, nor the validity, priority, or enforceability of any Lien granted by the Debtor to the Agent or the Pre-Petition Agent.

20

25. The Liens, Super-Priority Claim and Junior Super-Priority Claim granted to the Agent under the DIP Credit Facility and this Order, and to the Pre-Petition Agent under this Order, and the priority thereof, and any payments made pursuant thereto, shall be binding (subject to the terms hereof) on the Debtors, any successor trustee for the Debtors, and all creditors of the Debtors, as provided in section 364(e) of the Bankruptcy Code.

26. The Agent's or any Lender's failure to seek relief or otherwise exercise its rights and remedies under the DIP Credit Facility or this Order, and the Pre-Petition Agent's or any Pre-Petition Lender's failure to seek relief or otherwise exercise its rights and remedies under this Order, shall not constitute a waiver of any of the Agent's, such Lender's, the Pre-Petition Agent's, or such Pre-Petition Lender's rights hereunder, thereunder, or otherwise.

27. Subject to the provisions of the DIP Loan Agreement, the Debtors and the Agent may amend, and the Agent and the Lenders may waive, any provision of the DIP Loan Documents without seeking the approval of this Court; *provided, however,* that such amendment or waiver, in the judgment of the Debtors and the Agent, is either nonprejudicial to the rights of third parties or is not material. Except as otherwise set forth in the foregoing sentence, no waiver, modification, or amendment of any of the provisions hereof or of the DIP Loan Documents shall be effective unless set forth in writing, signed by the parties hereto and approved by the Court.

28. In the event of any inconsistency between the terms and conditions of any DIP Loan Document and of this Order, the provisions of this Order shall govern and control.

29. Any Subsidiary (as defined in the DIP Loan Agreement) of WINC that hereafter becomes a debtor in a case under chapter 11 of the Bankruptcy Code in this Court shall automatically, immediately upon the filing of a petition for relief for such Subsidiary, be deemed to be one of the "Debtors" hereunder in all respects, and all the terms and provisions of this Order, including, without limitation, those provisions granting security interests in, and Liens upon, the DIP Collateral, and superpriority claims in each of the Debtor's chapter 11 cases, shall immediately be applicable in all respects to such Subsidiary and its chapter 11 estate.

30.     Notwithstanding anything to the contrary in this Order or the DIP Loan Agreement, the Debtors shall maintain accurate accounting records of all post-petition transactions, including, without limitation, all Post-Petition Intercompany Transfers.  Subject to the terms of the DIP Loan Agreement and the payment of all Obligations due to the Agent and Lenders thereunder, to the extent any loans or advances under the DIP Loan Agreement are repaid by a Debtor or repaid by realization on DIP Collateral owned by a Debtor in an amount that exceeds the proceeds of the loans or advances received by such Debtor, the Court retains the right to enforce rights of contribution, subrogation and allocation among the Debtors with the intention that the creditors and interest holders of such Debtor are not prejudiced by the joint and several nature of the Obligations or the manner or sequence of foreclosure by the Lenders or Pre-Petition Lenders, and that creditors are restored to the extent possible to the same relative priority and position as they held on the Petition Date prior to the incurrence of the Obligations.

31.     Subject solely to Paragraph 7 above, all actions of the Debtors, the Agent, the Lenders, the Pre-Petition Agent and the Pre-Petition Lenders undertaken pursuant to or in reliance upon the Interim Order are hereby authorized and approved in all respects.

32.     All Objections not resolved are hereby overruled.

SO ORDERED by the Court this _____ day of August, 2001.


_____
DAVID H. ADAMS
UNITED STATES BANKRUPTCY JUDGE


WE ASK FOR THIS:

   /s/ Dion W. Hayes

McGUIRE WOODS LLP
H. Slayton Dabney, Jr., Esq.  (VSB# 14145)
Dion W. Hayes, Esq.  (VSB# 34304)
One James Center
901 East Cary Street
Richmond, Virginia 23219
(804) 775-1000

        -and-

WILLKIE FAR & GALLAGHER
Marc Abrams, Esq.
Rachel C. Strickland, Esq.
787 Seventh Avenue
New York, New York  10019-6099
(212) 728-8000

Co-Counsel for Debtor and
Debtors in Possession

NOTICE OF JUDGMENT OR ORDER
Entered on Docket _____ AUG  9 2001

## **CERTIFICATION PURSUANT TO LOCAL RULE 9022-1(c)(1)**

I hereby certify that the proposed Final order has been endorsed by all necessary parties.

\\FIN\55348.1                                     /s/ Dion W. Hayes_____